UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BECO DAIRY AUTOMATION, Inc., <br><br> Plaintiff, <br><br> v. <br><br> GLOBAL TECH SYSTEMS, Inc. and DOES 1-50, <br><br> Defendants. | 1:12-cv-01310 LJO SMS <br><br> MEMORANDUM DECISION AND ORDER RE: DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S FOURTH AMENDED COMPLAINT (Doc. 67) |

## I. INTRODUCTION

This litigation involves a contract dispute between Beco Dairy Inc. ("BECO") and Global Tech Systems, Inc. ("GTS") concerning the development and licensing of dairy technology.

## II. PROCEDURAL HISTORY

This litigation was initiated by BECO in Kings County Superior Court on July 10, 2012. BECO alleged breach of contract, fraud, and interference, and requested declaratory relief of its contractual rights related to its use of certain dairy automation products and technology. GTS removed this action to this Court. On August 17, 2012, GTS responded to the Complaint with a Motion to Dismiss for Failure to State a Claim and Motion to Strike; BECO was granted leave to amend its Complaint to make its fraud claims more specific. On September 27, 2012, BECO filed its First Amended Complaint. In response, GTS answered and counterclaimed against BECO, alleging breach of contract, interference, and misappropriation of intellectual property, and requesting declaratory relief, related to the same dairy automation products and technology. On March 11, 2013, BECO filed for stipulated leave to amend its Complaint to remove claims for breach of a joint venture and leave was granted on March 25, 2013.

Before BECO filed its amended Complaint, GTS filed for bankruptcy, and on April 23, 2013, an automatic stay issued. On October 28, 2013, the bankruptcy proceeding was dismissed. In accordance with the earlier order granting leave to amend, BECO filed its Second Amended Complaint (removing claims for joint venture breach) on November 12, 2013. GTS answered and counterclaimed on November 27, 2013. GTS Answer and Counterclaim ("GTS Counterclaim"), Doc. 16.

On October 17, 2013 (before the dismissal for the bankruptcy was entered), GTS filed a Complaint in the United States District Court for the District of New Mexico against BECO, *Global Tech Systems, Inc., v. Beco Dairy Automation, et al*. Case No. 1:13-cv-01006-JAP-KBM ("GTS Complaint"). While the GTS Complaint and Counterclaim were similar, the GTS Complaint included new claims that BECO infringed on eight patents GTS held. In response to the GTS Complaint, on November 12, 2013, BECO filed its answer and a Motion to Dismiss or Transfer. Ultimately, the New Mexico Court transferred the case to the Eastern District of California, where it was renumbered as 1:14-cv-00865----SKO ("Case 865"). Shortly thereafter, BECO petitioned to consolidate this (above-captioned) case with Case 865 and requested leave to amend its own Complaint. On December 9, 2014, the Court consolidated the matters into this case. Consolidation Order, Doc 57. The Court granted BECO leave to amend and closed Case 865.

BECO filed its third amended complaint ("TAC") December 18, 2014. Doc. 59. The TAC added an additional interference claim and seven claims related to the ownership and validity of the patents at issue in the GTS Complaint. *Id.* GTS moved to dismiss six of BECO's seven patent claims. Doc. 60. The Court granted this motion in part, and dismissed several of Plaintiff's causes of action, granting Plaintiff leave to amend most of the dismissed claims. Mem. Decision and Order ("March 3 Order"), Doc. 60 at 16-17.

BECO timely filed its fourth amended complaint, which includes four causes of action sounding in patent law. Fourth Am. Compl. ("FAC"), Doc. 65. Now before the Court is GTS's motion to dismiss two of these causes pursuant to Rule 12(b)(6) or 12(b)(1). Mem. of P. & A. in Supp. of Def.'s Mot. to

2

Dismiss ("MTD"), Doc. 67. Plaintiff responded on April 21, 2015. Mem. of P. & A. in Opp'n ("Opposition"), Doc. 75. Defendant filed its reply on April 28, 2015. Reply to Pl.'s Opp'n ("Reply"), Doc. 78. The Court deemed these matters suitable for decision without oral argument pursuant to Local Rule 230(g).

### III. FACTUAL BACKGROUND

BECO is in the business of producing automated dairy technology. FAC ¶ 9. Around 1996, BECO conceived of developing an electronic "no moving parts" milk meter (the "Meter"). *Id.* at ¶10.

At some point prior to February 13, 2000, BECO began selling milk flow meters, as well as sensors that could detect the health of a dairy cow. *Id.* at ¶11. Around this time, BECO had an employee, Monte Lininger ("Lininger") who was tasked with researching the no-moving parts milk meter concept. *Id.* at ¶12. Lininger advised BECO that such a system could be developed by adding a third metal ring to BECO's existing flow meter. *Id.* BECO then realized it needed to collaborate with someone who had circuitry expertise to develop the Meter further. *Id.*

BECO's marketing director, Bob Borchert ("Borchert"), met with Victor Viesca ("Viesca"), the owner of a company in Mexico that manufactured parts for BECO. *Id.* at ¶13. Viesca introduced Borchert to Antonio Fematt ("Fematt"), a graduate student who had been working for Viesca, whom he thought could help develop the Meter. *Id.* Borchert introduced Fematt to BECO president Stan Brown in September 1997. *Id.* at ¶14. Beginning in "late 1997," BECO began paying Fematt $2,500 a month to work on the Meter. *Id.* at ¶16.

In March 2000, Borchert, Brown, Viesca, and Fematt began working with patent attorney, Dan Meanie, to start a patent application for the Meter technology. *Id.* at 62.[1] Two patent applications were filed on February 13, 2001 for products related to the Meter. *Id.* These applications matured into four

---

[1] Plaintiff alleges in separate places that Meanie was employed by Plaintiff, FAC ¶ 62, and Defendant, FAC ¶ 354. For the purposes of this motion, the Court reads the Complaint as asserting that Meanie was employed, in some capacity, by both parties.

3

U.S. patents. *Id.* Later, Meanie filed patent applications on the Pulsation System, which would also mature into four patents. *Id.*

On February 20, 2001 Borchert, Brown, Viesca and Fematt founded Defendant GTS, a New Mexico-based corporation. *Id.* at ¶ 25. Fematt acted as the president of GTS, though he did not become a GTS employee until December 2007. *Id.* at ¶ 26. In May 2001, Fematt moved back to California to work more closely with BECO. *Id.* at ¶ 28. BECO hired Fematt, and, in October 2001, sponsored his H1B visa. *Id.* at ¶ 29.

While at BECO, Fematt began development of a pulsation monitoring system ("Pulsation System"), a "head's up" stand-alone automatic take-off system ("Take-Off System") and software that integrated these systems ("Parlor Scan"). *Id.* at ¶ 31. Along with the Meter, these products made up a complete product line ("Product Line"). *Id.* Fematt also helped BECO develop a cow identification system ("Cow ID system") while he was their employee. *Id.* at ¶ 33. Around the end of 2002, Jorge Mireles, an engineer contracted by GTS moved to Hanford to help design software integrating the Product Line with the Cow ID System. *Id.* at ¶ 35.

Between 2003 and 2005, BECO began to purchase Product Line components from GTS and GTS began to repay BECO for its investment in the Product Line. *Id.* at ¶¶ 37-40. In 2003, GTS opened its own facility in downtown Hanford. *Id.* at ¶ 38.

In April 2005, BECO and GTS entered into an agreement wherein GTS agreed to "take on" development of the Cow Identification system so long as BECO continued to pay Fematt's salary and expenses.[2] *Id.* at ¶ 41. Under the terms of this agreement, BECO possesses all rights to the completed Cow ID system. Cow ID Agreement ¶ (d).

In May 2005, BECO and GTS entered into an agreement regarding the Product Line. *Id.* at ¶ 42.

---

[2] It is unclear who legally employed Fematt at this time. The terms of this agreement state that, for the purpose of the Cow ID project, "GTS will charge BECO the same salary []Fematt is getting as BECO employee" and that BECO will stop charging GTS for []Fematt salary as it is happening at this moment." Cow ID Agreement ¶ (e), FAC Ex. D. BECO, however, maintains that Fematt remained a BECO employee until December of 2007. FAC ¶ 21.

4

Under the terms of this agreement, GTS possesses all rights to the Product Line and BECO has exclusive marketing rights to it in the continental US, Canada, Saudi Arabia and Japan. Product Line Agreement, FAC Ex. E. This agreement also describes that while GTS has obtained patent coverage for components of the Product Line, "the companies agree to decide jointly if any action will be taken on companies that infringe on the patents." *Id.*

Plaintiff asserts that at the time it filed its action, the Cow ID system was not completed and there were serious issues with the Meter. FAC ¶¶ 46-47. As time progressed, the parties' relationship disintegrated. Plaintiff alleges that Defendant failed to timely supply it with components for the Cow ID system and Product Line and failed to remedy defects discovered in 2009 and 2011, causing BECO to lose sales. *Id.* at ¶¶ 51-57. Plaintiff alleges that in 2013, Defendant began reaching out to Plaintiff's customers to sell them Cow ID and Product Line technology directly. *Id.* at ¶ 58. Ultimately, GTS refused to provide Plaintiff with the products at all. *Id.* at ¶ 61.

## IV. STANDARD OF DECISION

### A. 12(b)(6) Legal Standard

A motion to dismiss pursuant to Fed R. Civ. P. 12(b)(6) is a challenge to the sufficiency of the allegations set forth in the complaint. A 12(b)(6) dismissal is proper where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balisteri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1990). In considering a motion to dismiss for failure to state a claim, the court generally accepts as true the allegations in the complaint, construes the pleading in the light most favorable to the party opposing the motion, and resolves all doubts in the pleader's favor. *Lazy Y. Ranch LTD v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

To survive a 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility for entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations omitted). Thus, "bare assertions . . . amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . are not entitled to be assumed true." *Iqbal*, 556 U.S. at 681. In practice, "a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Twombly*, 550 U.S. at 562. In other words, the Complaint must describe the alleged misconduct in enough detail to lay the foundation for an identified legal claim.

To the extent that the pleadings can be cured by the allegation of additional facts, the plaintiff should be afforded leave to amend. *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990) (citations omitted).

**B.     12(b)(1) Legal Standard**

Federal Rule of Civil Procedure 12(b)(1) provides for dismissal of an action for "lack of subject-matter jurisdiction." Faced with a Rule 12(b)(1) motion, a plaintiff bears the burden of proving the existence of the court's subject matter jurisdiction. *Thompson v. McCombe*, 99 F.3d 352, 353 (9th Cir.1996). A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears. *Gen. Atomic Co. v. United Nuclear Corp.*, 655 F.2d 968, 968–69 (9th Cir.1981).

A challenge to subject matter jurisdiction may be facial or factual. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.2000). As explained in *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1038 (9th Cir.

2004):

> In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.

"If the challenge to jurisdiction is a facial attack, i.e., the defendant contends that the allegations of jurisdiction contained in the complaint are insufficient on their face to demonstrate the existence of jurisdiction, the plaintiff is entitled to safeguards similar to those applicable when a Rule 12(b)(6) motion is made." *Cervantez v. Sullivan,* 719 *F.Supp.* 899, 903 (E.D.Cal.1989), *rev'd on other grounds*, 963 F.2d 229 (9th Cir.1992). "The factual allegations of the complaint are presumed to be true, and the motion is granted only if the plaintiff fails to allege an element necessary for subject matter jurisdiction." *Id.*; *see also Cassirer v. Kingdom of Spain*, 580 F.3d 1048, 1052 n. 2 (9th Cir.2009), *rev'd on other grounds en banc*, 616 F.3d 1019 (9th Cir.2010) (applying *Ashcroft v. Iqbal*, 556 U.S. 662, (2009), to a facial motion to dismiss for lack of subject matter jurisdiction).

## V. ANALYSIS

### A.     Whether Plaintiff Has Standing to Bring Its Inventorship Claim

Plaintiff's tenth cause of action seeks a declaratory judgment stating that Lininger is a co-inventor of patents numbers 6,604,053 ("'053 Patent"), 6,722,208 ("'208 Patent"), 6,799,474 ("'474 Patent"), and 6,990,924 ("'924 Patent"). FAC ¶ 170. Plaintiff also seeks to establish that Brown is a co-inventor of the 053 patent,[3] and that Borchert and Viesca are not co-inventors of any of the four patents. *Id.* at ¶¶ 175-18. These patents are all related to the Meter technology. *Id.* at ¶¶ 170. These claims are, in substance, claims to correct inventorship under 35 U.S.C. § 256. *Larson v. Correct Craft, Inc.*, 569 F.3d 1319, 1325 (Fed. Cir. 2009). Defendant asserts that Plaintiff does not have standing because it has no ownership interest in any of the patents-in-suit. MTD at 3-5.

---

[3] While the FAC states actually claims that Brown is a co-inventor of a patent numbered 7,063,043, Plaintiff acknowledges that this is a clerical error and that it intended to assert that Brown is a co-inventor of the 053 patent. Opposition at 13, n. 3.

7

Constitutional standing requires that a plaintiff has suffered an injury-in-fact, that the injury is traceable to the conduct complained of, and that the injury is redressable by a favorable decision. U.S. Const. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To have standing to under Section 256, the Federal Circuit holds that a plaintiff must have a concrete financial interest in the patents at issue. *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1359 (Fed. Cir. 2001). This does not mean that the plaintiff must have an ownership interest in the patent. *Id.* A plaintiff's financial interest however, cannot be contingent upon on relief outside the scope of remedies available to the court. *Larson*, 569 F.3d at 1326-27 (dismissing case because Plaintiff's financial interests depended on his obtaining rescission of his patent assignments). For example, in *Chou* the Plaintiff had assigned her intellectual property interests to her university employer. 254 F.3d at 1359. However, because the university was obligated to pay named inventors a share of a patent's royalties, Plaintiff had standing to under Section 256 to assert inventorship. *Id.* The Plaintiff in *Larson*, however, who had assigned rights in boat parts he designed, did not have standing because "[h]is only path to financial reward under § 256 in this case involves him first succeeding on his state-law claims and obtaining rescission of the patent assignments." 569 F.3d at 1326-27. An interest that is contingent on relief that the court cannot provided cannot support standing. *Id.* at 1327.

BECO argues that it has a concrete interest based on its marketing rights to the products and because it has agreed to "share the expense and royalties, if any, on any patent litigation." Opposition at 3. GTS first argues that there is no factual basis for this assertion in the FAC, since this statement appears in a contract attached as an exhibit to the FAC. Reply at 1.

"A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P. 10(c). Courts in the Ninth Circuit "may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). The contract at issue here is discussed extensively in the FAC, and provides the basis for Plaintiff's first, second, third, and eighth

causes of action. FAC ¶¶ 42-45, 78-88, 92-109, & 158-161. Because the FAC necessarily relies upon the contract, and because Defendant does not contest its authenticity, this Court considers it to be incorporated by reference. *Tribank Capital Investments, Inc. v. Orient Paper, Inc.*, 523 F. App'x 484, 485 (9th Cir. 2013).

Defendant next argues that BECO's agreement to share the "expenses and royalties" associated with patent litigation does not amount to a concrete interest in the patents in suit because changing the identities of the inventors on the patents would not generate any direct financial rewards for Plaintiff. MTD at 5. BECO responds that it has a "direct interest in ensuring that the patents are valid and enforceable." Opposition at 3. Defendant counters that BECO is unlike the plaintiff in *Chou*, 254 F.3d at 1359, because BECO does not identify how it might profit financially by altering the list of named inventors. Reply at 2. The Court agrees that the FAC pleads no such facts.

The FAC also fails to allege facts that would support standing based on an alleged interest in avoiding litigation expenses. In cases where a declaratory plaintiff asserts standing on the basis of threatened litigation, the Federal Circuit requires the plaintiff to: (1) hold "a recognized interest in a patent that could be adversely affected by an action brought under section 256," and (2) show that "another party with a right to bring an action under section 256 has created in the declaratory plaintiff a reasonable apprehension that it will do so." *Fina Oil & Chem. Co. v. Ewen*, 123 F.3d 1466, 1471 (Fed. Cir. 1997). "This standard respects the constitutional requirement of an actual controversy." *Id.* Plaintiff has met the first requirement because it has alleged that it holds a financial interest in the patents-in-suit by virtue of the agreement that it will share in the royalties the patents generate as well as the costs of litigating claims to obtain royalties. FAC Ex. E. Plaintiff, however, fails to meet the second requirement. As Defendant points out, Plaintiff has not pleaded the existence of "another party" with the right to bring an inventorship claim who has done something to cause Plaintiff "reasonable apprehension" that

inventorship is in question.[4] Reply at 2. Rather, Plaintiff points to its own suit as the basis for concluding that the GTS' ownership of the patents is threatened. This contradicts the *Fina* Court's requirement that a plaintiff is presented with, rather than manufactures, an actual controversy.

The Court previously dismissed the inventorship claim from the TAC on the basis that Plaintiff failed to allege facts that would show that Lininger's work on any of the patents-in-suit entitled him to be named an inventor. Doc. 64 at 8. The Court does not reach this issue now, because it finds Plaintiff lacks standing to bring the argument.

For these reasons, the Court GRANTS Defendant's motion to dismiss Plaintiff's tenth cause of action. Problems identified in the Court's previous Order suggest that further amendment would be futile. However, in an abundance of caution, and because standing was not raised in that Order, the Court grants Plaintiff leave to amend this claim.

**B.     Inequitable Conduct Claim**

Plaintiff's thirteenth cause of action alleges that all patents-in-suit are unenforceable, in part, because of Defendant's inequitable conduct. FAC ¶¶ 345, 352-377. Plaintiff claims that the patents are unenforceable because the patent attorney failed to disclose material prior art and that Defendant concealed Lininger's contributions to work on the patents. *Id.* at ¶¶ 354, 373. Defendant argues that Plaintiff's allegations sounding inequitable conduct fail to meet the heightened pleading standard required for claims sounding in fraud. MTD at 13.

The Federal Circuit has made clear that inequitable conduct "while a broader concept than fraud, must be pled with particularity" under Rule 9(b). *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009). "[T]he accused infringer must prove by clear and convincing evidence that the applicant knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011).

---

[4] The only individuals who might plausibly claim ownership under BECO's facts are Lininger and Brown. Neither of them are party to this action and Plaintiff has not alleged that either have threatened to assert ownership claims.

Pleadings will only survive a motion to dismiss "if the plaintiff's complaint recites facts from which the court may reasonably infer that a specific individual both knew of invalidating information that was withheld from the [US Patent and Trade Office] and withheld that information with a specific intent to deceive the PTO." *Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011). It may only require "but a few facts" to plead a viable claims, as Plaintiff observes. The test is whether a party has plead "the who, what, when, where, and how of the alleged fraud." *Exergen*, 575 F. 3d at 1327 (internal quotations omitted).

As discussed in the Court's previous order, an allegation of inequitable conduct must "name the specific individual associated with the filing or prosecution of the application issuing as the [subject] patent, who both knew of the material information and deliberately withheld or misrepresented it." *Id.* at 1329 (citation omitted). The allegation must also identify "which claims, and which limitations in those claims, the withheld references [or misrepresentations] are relevant to . . ." *Id.* (citation omitted). Further, the allegation must identify "where in those references the material information is found." *Id*. (citation omitted). Finally, an inequitable conduct allegation must identify how the alleged misrepresentation or omission is material to patentability. *Cumberland Pharm., Inc. v. Mylan Institutional LLC*, No. 12 C 3846, 2012 WL 6567922, at *4 (N.D. Ill. Dec. 14, 2012). For a withholding claim, the claimant must explain " 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims." *Exergen*, 575 F. 3d at 1329–30 (citation omitted). For example, in *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc*., the court found pleadings sufficient where the plaintiff identified who the actor was, the prior art that he allegedly failed to disclose, and where in the prior art the references could be found No. CIV. 08-309-JJF-LPS, 2009 WL 4928024, at *8 (D. Del. Dec. 18, 2009) *report and recommendation adopted*, No. CIV. 08-309-JJF-LPS, 2010 WL 2990039 (D. Del. July 22, 2010) (noting that parties stipulated to elements describing when and how references were relevant.).

### 1. **Meanie Allegations**

Plaintiff claims that Meanie prosecuted the four Flow Meter patents ('053, '208, '474, and '043) as well as the four Pulsation System patents ('924, '828, '296 and '673). FAC ¶¶ 354, 363. Plaintiff identifies prior art that Meanie allegedly failed to disclose that Plaintiff alleges would have been material to the prosecution of each of these patents. *Id.* at ¶¶ 358-361, 366-370. While Plaintiff alleges more detail than it did in the previous version of its Complaint, these allegations still fall far short of the *Exergen* standard. Plaintiff fails to identify "which claims, and which limitations in those claims, the withheld references [or misrepresentations] are relevant to . . ." *Exergen*, 575 F. 3d at 1329. Nor does it identify "where in those references the material information is found." *Id*. Plaintiff also does not explain "'why" the withheld information is material and not cumulative, and "how" an examiner would have used this information in assessing the patentability of the claims. *Id.* at 1329–30. Finally, as Defendants point, out, Plaintiff overlooks the obligation to identify "when" Meanie should have become aware of these references in the context of application timelines. Defendant points out one reason why the "when" is important where it discusses that several of the references Plaintiff claimed were fraudulently withheld from three of the Pulsation system patents were actually not published until after those patents were issued. Opposition at 15.

Plaintiff also alleges that Meanie failed to disclose the "existence of other applications" to the PTO. *Id.* at ¶ 355. It is not clear from the FAC to which applications Plaintiff refers. In its Opposition, Plaintiff clarifies that it is alleging that Meanie "failed to disclose . . .the existence of GTS' other patent applications." Opposition at 19. Defendant argues that it is still unclear what these applications are. Reply at 8. The Court understands this as a claim that Meanie did not disclose the existence of Flow Meter and Pulsation system applications not before a particular examiner to other reviewing examiners. This reading takes into account Plaintiff's statement that "it is important to note" that three examiners evaluated the four Flow Meter Patents and that two examiners evaluated the four Pulsation System Patents. *Id.* at ¶¶ 354, 363.

These claims are contradicted by allegations made earlier in the FAC. As far as the Pulsation System Patents go, Plaintiff alleges that the '296 and '848 patents are continuations of the '924 patent. FAC ¶¶ 69-70. Continuation patents, by definition, rely on the terms of the parent patent. *See* 37 C.F.R. § 1.114. The '673 patent is described as an independent patent. FAC ¶ 71. However, the same patent examiner responsible for reviewing the '924 and '848 patents also reviewed the '673 patent. *Id.* at ¶ 363. It is absurd to believe that Meanie would have tried to withhold the existence of the other patents from the same reviewer. As for the Flow Meter patents, the '474 and '043 patents are alleged to be divisional patents of '208 parent patent. *Id.* at ¶¶ 66-67. Divisional patents also necessarily incorporate the parent patent. 35 U.S.C. § 121.

The '053 patent is not alleged to rely upon any of the other patents. However, Plaintiff fails to assert details that would support a viable claim that Meanie acted inequitably in prosecuting the '053 patent. In its Opposition, Plaintiff cites to examples of claims the PTO rejected for the '043, '924, '848, and '673 patent applications as evidence that the identification of co-pending applications is material *per se*. Opposition at 20. This argument does not address why disclosure of any of the claims in the co-pending applications would have been material, as opposed to cumulative, to the prosecution of the '053, or any patent specifically. Even if Plaintiff intended to assert that every claim in every patent was material or duplicative, it still failed to explain the how these claims were relevant to one another. *Exergen*, 575 F.3d at 1329. ("Information is material if a reasonable examiner would have considered it important to the patentability of a *claim*.") (emphasis in original). Finally, Plaintiff is silent on the issue as to *when* Meanie was supposed to have concealed the existence of the co-pending application.[5]

For all of the above reasons, the Court finds that Plaintiff failed to make a plausible argument that the patents-in-suit may be unenforceable on the basis of alleged inequitable conduct on Meanie's part. The Court gave Plaintiff ample guidance in its last Order regarding the pleading standards required

---

[5] Timing is also particularly important in this case, given that Plaintiff acknowledges in its briefing that another attorney took over the prosecution of one of the patents. Opposition at 27, n. 6.

to allege inequitable conduct under Rule 9(b). Doc. 64 at 15-16. Thus, there is no reason to believe that further opportunity to amend would not be futile.

### 2. Concealment Allegations

Plaintiff also alleges that Defendant is liable under an inequitable conduct theory because it, as a corporation, "attempted to conceal Lininger's co-inventorship of the Meter from the PTO." FAC ¶ 67. Defendant argues that this claim must fail because a corporation cannot commit inequitable conduct. MTD at 20. Plaintiff asserts that Defendant may be liable for the inequitable conduct of its employees under an agency theory. Opposition at 22.

Plaintiff is correct that an individual's actions may be imputed to a corporate patent owner. *Avid Identification Sys., Inc. v. Crystal Imp. Corp.*, 603 F.3d 967, 973 (Fed. Cir. 2010) ("If an individual who is substantively involved in the preparation or prosecution of an application fails to comply with his duty of candor, then that individual's misconduct is chargeable to the applicant for the patent, and the applicant's patent is held unenforceable."). While *liability* may be imputed to a corporate entity, the *conduct itself* must be attributed to an individual. *Delano Farms Co. v. California Table Grape Comm'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011). As discussed in the Court's previous order, a plaintiff "must recite facts which the court may reasonably infer that each individual a) knew of invalidating information that was withheld from the PTO and b) withheld that information with a specific intent to deceive." Doc. 64 at 16 (citing *Delano*, 655 F.3d at 1350) (emphasis added). The requirement that an individual be charged with inequitable conduct is based on patent regulations that place the duty to disclose on individuals. 37 C.F.R. § 1.56(a) ("Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [PTO] . . ."; *id.* at § 1.56(c) (identifying classes of individuals).

The Federal Circuit has found patents unenforceable for failure to correctly name inventors "where the named inventors acted in bad faith or with deceptive intent." *Bd. of Educ. ex rel. Bd. of Trustees of Florida State Univ. v. Am. Bioscience, Inc.("FSU")*, 333 F.3d 1330, 1343 (Fed. Cir. 2003).

For example, a patent was found to be unenforceable where two named inventors deliberately concealed a true inventor's involvement in the conception of the invention and "engaged in a pattern of intentional conduct designed to deceive the attorneys and patent office as to who the true inventors were." *Frank's Casing Crew & Rental Tools, Inc. v. PMR Technologies, Ltd*, 292 F.3d 1363, 1376 (Fed. Cir. 2002). In contrast, the *FSU* Court found that the failure to identify a former employer to PTO would not support a finding of inequitable conduct, where that employer was found not to be a co-inventor. *FSU*, 333 F.3d at 1344. An individual "who simply shares ideas with an inventor on the relevant subject matter" is not necessarily a co-inventor and cannot be the basis for such a finding. *Brixham Solutions Ltd. v. Juniper Networks, Inc.*, No. 13-CV-00616-JCS, 2014 WL 250204, at *6 (N.D. Cal. Jan. 22, 2014) (citing *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1460 (Fed. Cir. 1998). Thus, to survive a motion to dismiss based on the concealment of an inventor, a plaintiff must also plead facts to support that the omitted individual was, indeed, an inventor. *Id.*

     Plaintiff argues Defendant should be liable for allegedly inequitable conduct on the part of its "agents" Fematt, Brown, Borchert, and Viesca on the basis that they failed to disclose Lininger's status as an inventor in all the patents-at-issue. Opposition at 23. In support of this argument, Plaintiff points to paragraphs in the FAC that identify these individuals as being the inventors on the patents. *Id.* (citing FAC ¶¶ 64-71). For the sake of this motion, the Court accepts Plaintiff's representation that its concealment allegations are directed at Fematt, Brown, Borchert and Viesca. *Gen-Probe Inc. v. Becton, Dickinson & Co.*, No. 09-CV-2319 BEN NLS, 2012 WL 5379062, at *2 (S.D. Cal. Oct. 30, 2012). Even with this allowance, Plaintiff failed to articulate a viable claim against these individuals under the heightened pleading standards because it fails to allege any specific conduct that would amount to fraudulent concealment. Plaintiff's own facts describe that Meanie[6] was solely responsible for prosecuting the patents at issue and that he failed to disclose certain references and prior art to the PTO.

---

[6] Or his successor for that matter. *See*, n. 5, *supra.*

15

FAC ¶¶ 73, 354-72. Plaintiff also alleges that Borchert and Fematt *suggested* to Brown that they might be better off if Lininger's name was left off the patent applications. Plaintiff, however, does not allege that any of them *agreed* to this course of action, or more importantly, that any of them directed Meanie to leave Lininger's name off the patent applications. FAC ¶ 375. Rather, Plaintiff would have the Court assume that the mere fact that these individual later assigned their ownership interests to the Defendant corporation is enough to form a basis for a charge of fraudulent activity. *Id.* These facts are insufficient basis for the Court "reasonably infer" that Borchert, Fematt, Viesca or Brown took any affirmative acts to conceal Lininger's alleged contributions to the patents in suit, much less that they acted with the requisite state of mind. *Exergen*, 575 F.3d. at 1327.

For these reasons, the Court finds that Plaintiff has failed to allege facts that would support its charge that the patents are unenforceable due to Defendant's inequitable conduct. The Court gave Plaintiff ample guidance in its last Order regarding the pleading standards required to allege inequitable conduct under Rule 9(b). Doc. 64 at 15-16. Thus, there is no reason to believe that further opportunity to amend would not be futile.

**C.      Misuse**

Plaintiff's thirteenth cause of action also alleges that the patents-in-suit are unenforceable under the doctrine of misuse because Defendant attempted to enforce them outside of the United States. FAC ¶¶ 345-351. Specifically, Plaintiff alleged that Defendant threatened to sue Plaintiff if Plaintiff attempted to sell any of the patented products outside the United States without Defendant's prior written authorization. *Id.* at ¶346. Plaintiff also points to a statement made in an email that is attached to the Complaint. FAC Ex. U, Doc. 65-21 at 5. The email responds to BECO's request to be given exclusive rights to market products in China and Russia. *Id.* GTS responds that it will not grant exclusive rights to these territories to BECO without a minimum expected sales number, and indicated that it would respond similarly to other companies seeking its terms. *Id.* While this does not appear on the face of the FAC, for the purpose of dealing with the motion to dismiss, the Court considers it incorporated by

reference in ¶ 346 of the FAC. *See Tribank Capital Investments*, 523 F. App'x at 485.[7]

Patent misuse is defined as "the patentee's act of impermissibly broadening the physical or temporal scope of the patent grant with anticompetitive effect." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1328 (Fed. Cir. 2010) (internal quotations omitted). Defendant argues that Plaintiff does not allege the existence of any concrete "anticompetitive effect" because Plaintiff does not allege harm to any other entity besides itself. MTD at 10. Defendant cites to *Seaboard Int'l, Inc. v. Cameron Int'l Corp.*, No. 1:13-CV-00281-MLH-SK, 2013 WL 3936889, at *3 (E.D. Cal. July 30, 2013), for the proposition that an allegation of injury to an individual firm is insufficient to plead an anticompetitive injury. *Id.* This holding is based on the Ninth Circuit's opinion that, in the context of an antitrust claim, a Plaintiff must allege an "injury to the market or to competition in general, not merely injury to individuals or individual firms." *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 812 (9th Cir. 1988).

The Federal Circuit and the Supreme Court have found patent misuse based on evidence from a particular contract where the misuse is a type recognized in the case law. *Princo,* 616 F.3d at 1328 (collecting cases). For example, a patentee who conditions the license on a patent licensee's purchase of an unpatented material for use in the invention may, under certain conditions, be impermissibly extending the scope of the subject matter encompassed by the patent grant. *Monsanto Co. v. McFarling*, 363 F.3d 1336, 1341-42 (Fed. Cir. 2004) (internal citations omitted). Similarly, a patentee may not require a licensee to pay licensing fees after a patent has expired. *Princo,* 616 F.3d at 1327 (citing *Brulotte v. Thys Co.*, 379 U.S. 29 (1964)). In these cases the Federal Circuit has found that "when the patentee has used restrictive conditions on licenses or sales to broaden the scope of the patent grant, [] an accused infringer may invoke the doctrine of patent misuse to defeat the patentee's claim." *Id.* at 1328.

However, in cases like this one, where a plaintiff does not allege an activity that is patent misuse

---

[7] Plaintiff also points to the counterclaims Defendant asserted with regards to the second amended complaint (SAC) that Plaintiff's sales to customers in the Ukraine violated its patent rights. Because the FAC supersedes the SAC, these counterclaims are not operative.

*per se*, a "rule of reason" analysis applies. *Monsanto Co.*, 363 F.3d at 1341 (Fed. Cir. 2004). In such cases, "a factual determination must reveal that the overall effect of the license tends to restrain competition unlawfully in an appropriately defined relevant market." *Windsurfing Int'l Inc. v. AMF, Inc.*, 782 F.2d 995, 1001-02 (Fed. Cir. 1986).

The Court reads the email as a representation made by GTS that it would file suit if BECO sold products without its consent outside the U.S., and that it would not grant any company exclusive rights to its patents unless it agreed to minimum sales numbers. Considered in a light most favorable to Plaintiff, BECO's representations may impermissibly broaden the scope of its patent if Plaintiff can show that GTS prevented sales conducted entirely outside the U.S. *Cybiotronics, Ltd. v. Golden Source Electronics Ltd.*, 130 F. Supp. 2d 1152, 1171 (C.D. Cal. 2001) ("[A]n 'offer to sell' made within the United States that contemplates a 'sale' of goods outside of the United States is not within the permissible scope of liability for 35 U.S.C. § 271(a). No direct infringement can be found solely premised on an "offer to sell" within the United States, unless the sale that is contemplated by the "offer" is or will also be consummated within the United States."). While this conduct may constitute broadening, it is not in a class of conduct that the Federal Circuit or Supreme Court has found to be misuse *per se*. Therefore, Plaintiff must also allege facts that tend show that on "overall effect" of Defendant's actions "restrained competition unlawfully in an appropriately defined relevant market." *Windsurfing Int'l*, 782 F.2d at 1001. Parties did not provide, nor could the Court find, any cases discussing the pleading standards for unlawful restraint of competition in the context of a patent misuse claim or defense.

In Sherman Act cases, proving injury to competition "ordinarily requires the claimant to prove the relevant geographic and product markets and to demonstrate the effects of the restraint within those markets." *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1373 (9th Cir. 1989) (internal citations omitted). Because whether a market is relevant is considered a factual issue, antirust claims will survive a motion to dismiss "unless it is apparent from the face of the complaint that the alleged

market suffers a fatal legal defect" or is "facially unsustainable." *Newcal Industries, Inc. v. Ikon Office Solution*, 513 F.3d 1038, 1044 (9th Cir.2008) ("There is no requirement that [the market definition and market power] elements of the antitrust claim be pled with specificity."). A plaintiff must allege "injury to competition in the market as a whole, not merely injury to itself as a competitor." *Gorlick Distribution Centers, LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1024-25 (9th Cir. 2013); *see also Orchard Supply Hardware LLC v. Home Depot USA, Inc*., 967 F. Supp. 2d 1347, 1358 (N.D. Cal. 2013. A plaintiff must also identify the market by its constituent products. *Newcal Industries*, 513 F.3d at 1045 (complaint adequately identified the following product markets: (1) "replacement Copier Equipment for IKON and GE customers with Flexed IKON Contracts," (2) "Copier Service for IKON and GE customers with Flexed IKON Contracts," (3) "Copier Service for Canon and Ricoh brand Copier Equipment," and (4) "Copier Equipment.").

Here Plaintiff does not even identify which market it alleges that Defendant suppresses. As Defendant points out, Plaintiff alleged that Defendant's actions "threatened" Plaintiff, creating a "reasonable apprehension" that Plaintiff will be subject to "ongoing threats of infringement suits", FAC ¶ 345, and has "attempted to sue Plaintiff," FAC ¶¶ 348-350. The FAC gives no basis for believing that these assertions, if true, would actually suppress competition in any particular market. Even if Defendant represented that it would take a similar approach with other companies in the dairy industry, Plaintiff has not alleged how such a statement or belief would suppress competition either. Plaintiff has only alleged "injury to itself as a competitor," as opposed to "injury to competition in the market as a whole." *Gorlick Distribution Centers*, 723 F.3d at 1024-25. Therefore, its claim is facially unsustainable.

For these reasons, the Court GRANTS Defendant's motion to dismiss Plaintiff's thirteenth cause of action. While the Court can find no foundation in the FAC for the argument that Defendant's actions caused anticompetitive effects in a given product market, it will grant Plaintiff leave to amend this claim in an abundance of caution.

## VI. CONCLUSION AND ORDER

For the reasons discussed above, the Court GRANTS Defendant's motion to dismiss Plaintiff's tenth and thirteenth causes of action, Doc. 67, as follows:

Plaintiff is granted leave to amend its tenth cause of action.

Plaintiff is granted leave to amend its thirteenth cause of action, to the extent that it is based on patent misuse. Plaintiff should only amend if amendment will not be futile based on the law and holding in this Order.

Plaintiff is not granted leave to amend the thirteenth cause of action, to the extent that is based on charges of inequitable conduct.

Plaintiff shall file any amended complaint within 14 days of this order.

No later than 21 days after service of any amended complaint, Defendant shall file a response thereto.

IT IS SO ORDERED.

Dated: __**May 8, 2015**__               __/s/ Lawrence J. O'Neill__
                                                            UNITED STATES DISTRICT JUDGE